## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **EVA ZIMNOCH** | : | **CASE NO.:** |
| **Plaintiff** | : | |
| | : | |
| **V.** | : | |
| | : | |
| **TOWN OF WILTON** | : | |
| **Defendant** | : | **NOVEMBER 21, 2019** |

## <u>COMPLAINT</u>

**I.   INTRODUCTION**

1.   This is an action for gender discrimination and retaliation in violation of Title

VII of the Civil Rights Act of 1964 and Connecticut General Statutes Sections

46a-60(b)(1) and 46a-60(b)(4).

**II.   PARTIES**

2.   Plaintiff, Eva Zimnoch ("Zimnoch") is a female individual residing in Norwalk,

Connecticut.

3.   Defendant, Town of Wilton ("Town") is a Connecticut municipality.

**III.   JURISDICTION AND VENUE**

4.   This Court has subject matter jurisdiction over Zimnoch's federal law claims

pursuant to 28 U.S.C. Section 1331 because they assert a federal question

under Title VII.

5.   This Court also has subject matter jurisdiction over Zimnoch's state law

claims pursuant to 28 U.S.C. Section 1367 because the claims are so related

to her federal claims that they form part of the same case or controversy

under Article III of the United States Constitution.

6.   Venue is proper in the District, as actions giving rise to this lawsuit occurred within this District.

**IV.   ADMINISTRATIVE REQUIREMENTS**

7.   On or about February 6, 2019, and again on or about April 5, 2019, Zimnoch filed charges of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), which were dual filed with the United States Equal Employment Opportunity Commission ("EEOC").

8.   On or about August 28, 2019, Zimnoch received releases of jurisdiction from the CHRO pursuant to Connecticut General Statutes Section 46a-101 and a Right to Sue letter from the EEOC.

**V.   FACTS**

9.   Zimnoch was hired by the Town on or about March 11, 2005, as a Police Officer.

10.   Prior to the details herein Zimnoch has received several awards, accommodations, and letters of recognition to include making Officer of the Year in 2015 upon her entry into the newly promoted position of Police Detective.  Zimnoch was the first and only female officer in the history of the Wilton Police Department to win the Officer of the Year award.

11.   On or about July 2, 2015, Zimnoch was promoted by the Town as the very first female ever in the history of the Wilton Police Department to the position and rank of Police Detective which was/is a tested position with a monetary stipend/pay raise.  In order to attain the rank of Detective, Zimnoch participated in a rigorous competitive testing process among her peers.

Zimnoch received the second-highest score on the Detective's exam, yet was chosen over the highest-scoring candidate.

12.     Zimnoch is the first, and still is the only, female Detective within the Town.

13.     With the exception of Zimnoch, there is only one other female Officer in any of the sixteen ranking positions above the rank of patrolman, who serves in the rank of Sergeant.

14.     On or around September 2, 2016, Zimnoch filed a charge of discrimination with the Connecticut Commission of Human Rights and Opportunities and United States Equal Employment Opportunity Commission, alleging gender-based discrimination against the Town.

15.     These claims revolved around, among other things, inappropriate comments about her attire, mocking her clothing, the implementation and discriminatory enforcement of a dress code specific only to the Detective Bureau. As retaliation for making CHRO related complaints, Zimnoch standing permission to carry her personally owned Glock 43 back-up pistol was rescinded by the Chief. Other examples of harassment and retaliation conducted mostly by Detective Scott Sear and Detective Kip Tarrant, include blocking her from her parking spaces, hiding keys to gain access to use the Department copy machine, refusing to work with her, as well as being subject to other unpleasantries and disparate treatment on a daily basis.

16.     On or about December 18, 2017,  Zimnoch choose not to engage in litigation against the town but instead agreed in a good faith effort to have her case resolved through private mediation with the hope to get back to work and to

change the illegal and unpleasant working environment she had previously experienced.  The Honorable Jonathan Silbert proceeded over the matter and a settlement agreement was reached between all parties.

17. Zimnoch returned to work after the conclusion of mediation, but her treatment and working environment did not improve and in fact got worse. New offences were committed by her peers and police management and were reported. The mediation settlement agreement and the conditions set forth within was never implemented in any genuine, meaningful or lasting manner by management.

18. Zimnoch was a tactical operator and member of the South Western Regional Response Team ("SWRERT"), which is a heavily armed and supposedly highly trained unit commanded by Wilton Police Lt. Gregg Phillipson. After Zimnoch brought to the attention of management what she believed was several significant team member and public safety issues being routinely conducted by the team, a series of inquiries and investigations surrounding her participation, which were previously not a subject of inquiry, ensued. The results of their inquiries and actions of management resulted in Zimnoch being placed on an "inactive list", essentially removing her permanently from the team. Zimnoch was the only female member on the team and her comments / complaint was intended to be constructive for the purpose of positive change, but instead was met with hostility, bias and discrimination for bringing attention to the significant team member and public safety issues observed.

19.    On February 23, 2018 Zimnoch was removed from the SWRERT because
       she had missed one February training due to an uncontrollable illness. Lt.
       Gregg Phillipson improperly relied upon the settlement agreement to assert
       that removal was required because she missed the February training, even
       though the agreement did not so require.

20.    Detective Sear continued not only to make demeaning and intimidating
       comments, but also began to refuse to work and speak with Zimnoch.
       Detective Sear's outward display of bullying and improper conduct towards
       Zimnoch was intimidating and unprofessional and created a hostile work
       environment.

21.    After seeking help from her supervisors regarding the continued and
       progressing issues with Detective Sear, Captain Robert Cipolla asked
       Zimnoch if she would "voluntarily" step down from the position of Detective
       and return to the lower position of Patrolman in the Patrol Division, because it
       was the "only thing [he] could think of" to resolve the ongoing issues with
       Detective Sear's improper behavior.

22.    Detective Sear subsequently admitted to police administration that he initiated
       and participated in events and conduct intentionally to make Zimnoch's life at
       work difficult and unpleasant.  Despite this, the Town took no corrective action
       against Detective Sear for his ongoing and consistent unprofessional
       behavior.

23.    Immediately following the CHRO mediation settlement, Lieutenant Robert
       Kluk was assigned to be the supervisor of the Detective Bureau. Lieutenant

Kluk is the third supervisor assigned to the detective bureau in the last five years. Lieutenant Kluk came to the Detective Bureau with no detective bureau experience or training specific to operating a detective bureau.  Shortcomings in management were evident. The conditions continued to deteriorate. Zimnoch tried to assist and gave opinion on the issues, but rather than taking her suggestions constructively, she was met with criticism and hostility. As a result, Lieutenant Kluk then focused his attention intently on micromanaging all aspects of Zimnoch's work performance to include sick time.

24.    Zimnoch advised Captain Cipolla and other administrators, on several occasions that her working conditions were in fact affecting Zimnoch's health. Zimnoch's health concerns were ignored again by management. During that time, Zimnoch was summonsed into Captain Cipolla's office regarding her use of sick days. Zimnoch was told if she didn't improve, she could face disciplinary action up to and including termination from the Police Department. It should be noted that Zimnoch had never been spoken to or disciplined in the past for improperly using sick time.

25.    While at the mediation meeting in New Haven with Judge Silbert, Captain Cipolla told then-Union President Sergeant Timothy Fridinger, during an impromptu conversation, that he planned to potentially come after Zimnoch for not giving enough advanced notice for calling out sick.

26.    Zimnoch was called into Captain Cipolla's Office and admonished for not rescheduling a fingerprint appointment and also for missing one training class.   Zimnoch again was told by Captain Cipolla that if she did not improve

that she would face disciplinary action up to and including termination.  Such harsh terms normally are reserved for serious offences, and not minor infractions.

27.    Zimnoch has conducted fingerprints for other co-workers on several occasions if they were running late, forgot their appointment, or simply as a courteous favor to her colleagues. This is common practice within the Police Department.

28.    Zimnoch later learned from Training Officer Michael Tyler that she was never included on the e-mail that he sent out to all persons receiving the training that she missed; therefore, Zimnoch didn't even know she had training that day.  Zimnoch's exclusion from training notifications could have affected Zimnoch's certification as a police officer by the State of Connecticut and her ability to maintain her position.  Captain Cipolla used this incident along with others mentioned previously to threaten her with termination.

29.    Captain Cipolla's application of discipline and animus displayed towards Zimnoch is not consistent with the manner in which he treats other, male, subordinates for similar reasons.

30.    On or around May 4, 2018, Captain Cipolla and Lt. Robert Kluk, unexpectedly and without any notice, placed Zimnoch on a Performance Improvement Plan. It was initially called a "Work Performance Evaluation," but subsequently was changed to a "Performance Improvement Plan." To her knowledge and the knowledge of the Police Union President, Sergeant Tim Fridinger, no officers in the Wilton Police Department have ever been placed on such a "Work

Performance Evaluation" that was later called a "Performance Improvement Plan."

31.   Zimnoch was not told before the Performance Improvement Plan was imposed on her that her job performance in any way was deficient.

32.   While initially told it was not disciplinary in nature, Zimnoch was subjected to extreme micro-management as a result, to which no other Detective was subjected.  Zimnoch was also asked to sign a document that she refused to sign without Union Representation present.

33.   After Zimnoch spent approximately three months operating under the Performance Improvement Plan and receiving no updates to her status as initially advised, she was summoned to a meeting with management with her union representative to discuss her status on the "plan". During that meeting Zimnoch provided copies of several written reports authored by other Detectives with many grammatical errors that were similar to what was described as her deficiencies. Zimnoch pointed out that others are not being subject to such scrutiny let alone being placed on a "plan".  Zimnoch told management that she felt she was being singled out and that their actions were retaliatory, discriminatory, and biased, and she wanted to be immediately be taken off of the "Work Performance Evaluation" /"Performance Improvement Plan." After making that claim, and at the conclusion of that meeting, she was told by management that she had improved and was no longer subject to the Performance Improvement Plan.

34.  Almost immediately after that meeting, and on August 7, 2018, Zimnoch's access to view the other Detectives' computer case reports in the computer records management system was removed. Zimnoch was allowed full access to view the other Detectives reports since entering the Bureau. Management removed Zimnoch's ability to access the other Detectives reports almost immediately after she used her coworkers reports as examples of how they made the same if not more grammatical errors in their reports than she.

35.  The intentional act by management to eliminate Zimnoch's access to critical information to do her job with any resemblance of normalcy in a Detective Bureau, was further compounded by the fact that none of the other two detectives wanted to work with her, barely spoke to her, and in the absence of the daily/weekly briefings essentially and fundamentally isolated Zimnoch and created a hostile work environment for her to perform her job. Management had full knowledge of this condition and promoted its creation either through their own act's and or through their failure to perform essential duties of management to address and change the caustic culture and environment allowed to exist and flourish inside the Detective Bureau.

36.  While Chief Lynch stated in a meeting that he and Captain Cipolla "most likely" would give the access back to Zimnoch, he never did. This access was almost immediately removed right after Zimnoch tried to show Captain Cipolla and Lt. Robert Kluk deficiencies in other reports prepared by other Detectives.

37.    Based on Zimnoch's solid history and reputation in the region as a skilled investigator, she often was used as an undercover officer by other police agencies to assist in narcotics investigations and other criminal matters.

38.    On June 6, 2018, Zimnoch was prevented by Captain Cipolla from assisting the Greenwich Police Department's narcotics unit with an undercover drug buy. Captain Cipolla gave reason for the denial stating the department did not have the recourses available even though Zimmoch's assignment to the task would only take a couple hours to complete. At the time that the request was made Zimnoch was caught up on all of her work assignments. She asked Lt. Kluk if there was anything else he would for her to do and he replied no everything was all caught up. Capt. Cipolla has never denied in fact has promoted assisting other agencies for positive networking purposes. Captain Cipolla subsequently told Zimnoch that the request to assist Greenwich PD was refused because she was on the Performance Improvement Plan.

39.    While Zimnoch was denied assisting Greenwich Police in a drug buy, Detective Sear, who serves as a board member for the South Norwalk Boat Club, was spending, and continues to spend, a large portion of his shift, on a daily basis, on-line ordering liquor, supplies, scheduling bartending hours, and updating the website for Club.  Detective Sears' conduct is not only known by management, but in many ways promoted despite the fact that Zimnoch has brought this to the attention of management and the Wilton police commission

during open public recorded meeting. Despite that fact, nothing has ever been done about Detective Sear's activities.

40.   In August 2018, Zimnoch interviewed a candidate for a patrol officer position in the Department.   This candidate happened to be a female-to-male transsexual.   The candidate had passed all previous segments of the testing process.   Upon learning this information, Zimnoch informed Lieutenant Kluk, who instructed Zimonch to "find something wrong" with the candidate. Zimnoch reported this comment to Captain Cipolla; however, it appears that no serious investigation was done. The candidate was not selected.

41.   After Zimnoch reported Lieutenant Kluk's directive to her to "find something wrong" with the candidate to her superiors, the Chief of Police sent an e-mail to his administrative staff, the Detective Bureau and Training Officer Michel Tyler. The Chief's e-mail ordered all personnel to give Captain Conlan all "notes or other information relative to the recent background and interviews from the recent candidates."   It also directed the recipients to notify Captain Conlan if they "have had conversations relative to any of them (the candidates) not being selected."   Furthermore, the Chief directed the recipients "not discuss matters as they pertain to the employment process" and that if any "candidate contacts you notify Captain Conlan as soon as possible."   Neither the Chief nor anyone from management had ever sent such an e-mail or directive before or during the hiring process or at any other time.

42.     No formal internal investigation into Lieutenant Kluk's conduct was initiated, no

        formal interviews were conducted of witnesses, and no discipline was

        administered.

43.     On another occasion Zimnoch was assigned an African American male

        applicant who had what was described as a tough upbringing. Despite the

        fact that Zimnoch expressed positive feedback, Lieutenant Kluk told her that

        he would not be picked for the position. Lieutenant Kluk then took possession

        of the applicant's file from Zimnoch, finding as many imperfections as he

        could in the applicant's background, and instructed Zimnoch to document

        them all.  Zimnoch, who has conducted background investigations for several

        years, felt very uncomfortable. The applicant was never selected. Fearing

        additional retaliation Zimnoch did not report this incident.

44.     On or about September 24, 2018, Chief Lynch and Captain Cipolla rejected

        serious complaints filed by Zimnoch, which included a complaint about

        Lieutenant Kluk's inappropriate comment about the transsexual candidate for

        the position of Police Officer. Additionally, a complaint that Lieutenant Kluk

        had made very offensive and disturbing sexual comments about the female

        juvenile victim of a sexual assault, and her complaint of being subjected to an

        uncomfortable and hostile work environment.

45.     Also on or around September 24, 2018, Detective Sear submitted a complaint

        that, two months earlier, Zimnoch had written her name on a square floor fan

        that he claimed he owned.  Detective Sear told Sergeant Fridinger, the Union

        President, that he filed the complaint because he was "fed up" with Zimnoch

filing complaints.  Zimnoch was subjected to an internal investigation as a result, during which Chief Lynch admitted that Detective Sear's complaint "absolutely" was retaliation, in front of Captain Cipolla and Sergeant Fridinger.

46.   Zimnoch subsequently learned that, as a part of his complaint, Detective Sear attempted to have an official incident number generated in the police computer system for the crime of vandalism, in order to open a criminal investigation and to have Zimnoch arrested.

47.   On October 16, 2018 Lieutenant Kluk angrily told Zimnoch that she was not to call Captain Cipolla when Zimnoch was unable to reach Lieutenant Kluk. He also told Zimnoch that she was not to contact Detective Sear at all.

48.   On October 24, 2018, Detective Sear and Zimnoch's supervisor Lieutenant Kluk reached out to a retired Lieutenant, Steve Bartek, both by telephone and by text message, asking him if he had been contacted by Zimnoch regarding the $20.00 fan that Detective Sear tried to have her arrested over, what she had told him, and asking to be informed if she contacted him again.

49.   Prior to holding Detective Bureau meetings, Lieutenant Kluk often holds impromptu and informal meetings with Detectives Sear and Tarrant outside the office setting without Zimnoch's participation or presence. After those meeting, all engage in an official meeting with Zimnoch. Their obvious and repeated exclusion of Zimnoch into Detective Bureau business serves as another example of how Zimnoch is isolated and excluded to a proper and harmonious working environment.

50.     In good faith and in the attempt to resolve the ongoing issues, all parties again met with Judge Silbert in October of 2018 to once again and in a final attempt try to mediate Zimnoch's concerns in front of Judge Silbert.

51.     While the parties initially agreed to hire a facilitator to try to improve the situation within the Detective Bureau, the Town's chose to wait until after the holidays to implement the facilitator's services. Human Recourses Director Sarah Taffel stated that she did not like, nor did she think any of Judge Silbert's mediating services were any good. This was coupled with the worsening harassment Zimnoch was experiencing, the disparaging comments made by the director of Human Recourses about the facilitator ultimately led Zimnoch to decide against participating. In addition, Taffel, stated that even if the facilitator did not work, that at least they tried something new. Taffel's aloof attitude with Zimnoch's concerns and unsafe/unhealthy working environment were quite worrisome to both Union President Fridinger and Zimnoch.

52.     Zimnoch continued to be segregated within the Detective Bureau and subjected to repeated harassment and bullying. The police administration, including Lieutenant Kluk, Captain Cipolla, Chief Lynch, Sarah Taffel, and Police Commissioner Donald Sauvigne, all continued to provide no resolve in the Bureau. In addition, management ignored and allowed for Detective Sear to alienate Zimnoch in the Bureau by allowing him to not work with her on a professional level at all.

53.     In an effort to limit Zimnoch's earning ability, Lieutenant Kluk changed
        Zimnoch's schedule, making it more difficult for her to obtain extra-duty
        details for extra compensation.  When Zimnoch asked if she had any say in
        the matter, Lieutenant Kluk stated "no."  Lieutenant Kluk then also began to
        require Zimnoch to get pre-approval from him for any extra-duty assignments.
        Zimnoch was the only Detective who had to seek such approval before
        signing up for extra-duty assignments.

54.     In addition, Lieutenant Kluk assigned Zimnoch many more cases than the
        other two detectives, making it harder for her to sign up for extra duty details
        as well.

55.     On or about December 4, 2018, Zimnoch met with Taffel, along with her
        Union president, Sergeant Fridinger, to discuss her ongoing concerns of
        harassment and retaliation and to formally file an EEO complaint. Zimnoch
        asked what Taffel would do in order to help her, and Taffel's response was
        that she needed to ask the Town's attorney and get back to Zimnoch. Taffel
        never got back to Zimnoch.

56.     On or about January 23, 2019, Zimnoch met with Captain Cipolla, Sergeant
        Fridinger, and Sarah Taffel to again discuss some of her concerns.

57.     As with previous meetings, Zimnoch's concerns were brushed off, and no
        concrete plan of action was discussed to address her concerns whatsoever.

58.     On or about January 31, 2019 Zimnoch asked Lieutenant Kluk if he would
        switch her schedule to the evening shift in order to be able to work overtime
        on February 5 and 6, 2019. Zimnoch was told by Lieutenant Kluk on two

separate occasions that Detective Sear had already requested to switch his schedule to evenings on those same days. This was inconsistent with the computerized scheduling system scheduler.

59.   Zimnoch had been experiencing a greater continual struggle in being able to sign up for extra duty assignments for extra funds than ever before.

60.   On or about February 1, 2019, a Bureau meeting was held by Lieutenant Kluk to discuss cases and extra duty assignments. During the meeting Lieutenant Kluk started off by speaking about extra duty details and how to go about signing up for them. While addressing Detective Sear, Detective Tarrant and Zimnoch, Lieutenant Kluk spoke derogatorily towards her which resulted in Detective Sear laughing at Zimnoch on several occasions.

61.   Lieutenant Kluk did nothing about Detective Sear's inappropriate behavior.

62.   Zimnoch told Lieutenant Kluk that she thought it was unfair that her work schedule was changed completely to accommodate Detective Tarrant in getting 100 plus extra hours, equivalent to approximately $8,000.00 extra money on monthly basis.  Detective Tarrant angrily stated, "I have mouths to feed" and was obviously upset with her comment.

63.   Zimnoch stated that she felt as if she was being bullied out of extra earnings that she was entitled to. Again, Detective Sear laughed disrespectfully.

64.   Zimnoch then mentioned that she did not feel it was fair to her that she was being assigned all the cases yet Detective Sear spends a majority of his shift working for the South Norwalk Boat Club by updating their website and managing bartenders' schedules to include ordering liquor for the club on

Police Department time and computer system. After Zimnoch brought this to the attention of the administration, Detective Sear was allowed to place a tinted protective screen on his computer monitor to prevent anyone from seeing what he was doing.

65. Detective Sear charged out of the room and called another Lieutenant, Lt. Hartman, to enter the room and overlook the meeting. Detective Sear angrily then picked up his phone and verbalized clearly that he was calling the Chief to see if he was available to attend the meeting.

66. These working conditions and the continual lack of resolve by the department caused Zimnoch additional health issues and long-term health concerns.

67. On February 1, 2019, Lieutenant Kluk told Zimnoch that her concerns were being ignored and that no one was helping her because of the "CHRO issues," and that they had instructions from town hall (while pointing his finger at the Town Hall building) not to help her.

68. On March 13, 2019, the Town gave Zimnoch a written reprimand for the events of February 1, 2019.  Zimnoch was never told by anyone that the Feb. 1, 2019 meeting was being investigated nor did anyone tell her that there would be any possible disciplinary action taken. Zimnoch was also not afforded a reasonable opportunity to provide a full explanation of what occurred during that meeting. All who attended the Feb. 1, 2019 meeting proceeded to the Chief's office minutes after with the exception of Zimnoch. Zimnoch was never called into the Chief's office to explain her side of the story when all others involved were in fact afforded that opportunity.

69.    Also on March 13, 2019, The Town suddenly and without warning placed Zimnoch on administrative leave pending a "fitness for duty" examination and required her to turn in her detective's badge and her two police duty issued firearms.

70.    The only reasons given for this at the time by Chief Lynch were (1) that Zimnoch missed an appointment to complete an employment fingerprint card of a resident on March 9, 2019, (2) that on the same day she did not call Captain Cipolla following an undercover narcotics buy, assisting the Norwalk Police Department Narcotics Unit at a gang-infested nightclub and handling cocaine, and (3) that she did not get permission to sign up for an extra-duty detail (which no other Detective needs to do).  The Chief did not elaborate on this last item, and then immediately stated he was still looking into it.

71.    Zimnoch immediately requested further explanation as to why she was placed on leave on March 13, 2019 from Human Resources Director Sarah Taffel.  A meeting was not scheduled to go over specifics until April 2, 2019, well over two weeks after being placed on administrative leave.

72.    The "fitness for duty" examination was not scheduled to take place until May 14 and 15, 2019, thus forcing Zimnoch to be out of work for more than three months total and limiting her income, as she lost entirely the ability to take extra-duty details to earn extra money.

73.    As part of the "fitness for duty" examination, the Town sent to the examiner a packet of materials that included many false, defamatory, and accusatory statements regarding alleged "concerns" with Zimnoch's behavior.

74.     The examination itself consisted of a two-day, comprehensive
        neuropsychological, psychological, and I.Q. test evaluation of Zimnoch.

75.     The "fitness for duty" examination totally exonerated Zimnoch, and she
        ultimately was returned to duty on or about June 11, 2019.

76.     Zimnoch is the only Detective ever referred for such a "fitness for duty"
        examination.

77.     Upon returning to work, Zimnoch's reputation as a well skilled officer and
        Detective was greatly tarnished and defamed.  Zimnoch was approached by
        Wilton residents, business owners, other officers from other jurisdictions, and
        out of town residents asking her if she was okay and stating that they heard
        she was being fired.

78.     Upon returning to work, Zimnoch asked that her grievance following the
        February 1, 2019 meeting, for which she received a written reprimand the
        same day that she was told to leave pending the fitness for duty test, be
        heard as soon as possible, as the grievance had been placed on hold
        pending the results of the fitness for duty examination.

79.     Zimnoch met with Chief Lynch, Captain Cipolla and Sergeant Fridinger at the
        Step One grievance or about June 27, 2019.  Chief Lynch quoted other
        officers' findings and versions of what occurred and completely discarded
        Zimnoch's side of the story. The Chief already had typed out and had on his
        desk his denial letter handed his denial letter to Zimnoch's grievance before
        Zimnoch walked into the Chief's office.

80.    Zimnoch requested a Step Two grievance hearing with the Police
       Commission.

81.    Upon arriving for the Step Two grievance hearing, Zimnoch found the door to
       the meeting room closed, suggesting that there was a meeting before the
       commission meeting.  Zimnoch's grievance was summarily denied by the
       Police Commissioners.

82.    Zimnoch submitted a Freedom of Information Act request for the video and
       audio from the Step Two grievance. Video shows an approximate 15-minute
       meeting behind closed doors before Zimnoch's arrival.

83.    Zimnoch learned that on or about October 1, 2019, the administration
       conducted a private investigation in hopes of finding any wrong doing on
       Zimnoch's part following a lock down drill conducted at one of the elementary
       schools. Zimnoch had debriefed during that drill and mentioned possible
       deficiencies.  The administration tried to make it appear that Zimnoch was out
       of line when in fact she simply was concerned for the children and trying to
       improve emergency response for the safety of the school children.

84.    Nothing came of this private investigation after several interviews. Zimnoch
       was never approached regarding this incident.

85.    Zimnoch made a complaint in early October 2019 to the first selectwoman,
       Lynne Vanderslice, and the Director of Human Recourses, Sarah Taffel
       regarding Training Officer Michael Tyler making a very disturbing sexual
       comment about a pregnant co-worker female officer who had miscarriages

and was unable to get pregnant, and her ability to fulfill the new open position of School Recourse Officer due medical issues.

86. Zimnoch's complaint was sent back to Captain Cipolla for investigation. Captain Cipolla had an unrecorded meeting with Officer Tyler before he met with Zimnoch, stating that she was the first one he was interviewing and recording the interview. Zimnoch submitted a complaint to Vanderslice and Taffel regarding the flawed and biased investigation, which was again, ignored.

87. Zimnoch has heard nothing regarding her concerns.

88. Zimnoch also requested documentation of Commissioner Don Sauvigne's alleged investigation into Zimnoch's working conditions in order to help her. Around the same time Commissoner Sauvigne stated that he felt bad for Zimnoch that management was not working, did not work, and in fact failed. This was said in front of Sarah Taffel and Union President Tim Fridinger. He stated he did not find anything in his investigatory efforts. Zimnoch also requested documents to back up Sauvigne's comment that he was told to stop investigation by Zimnoch.  Although more than fifty days have elapsed since that FOI was submitted, there has been no substantive response.

## VI.   COUNT ONE –DISCRIMINATION IN VIOLATION OF TITLE VII

89. Based on the foregoing, the Town discriminated against Zimnoch based on her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq*.

90.   The Town discriminated against Zimnoch intentionally, with malice, and/or with reckless indifference to Zimnoch's federally protected rights.

91.   The Town's actions have caused Zimnoch to suffer damages, including, but not limited to, lost compensation, wages and benefits, emotional and physical distress, damage to her reputation, as well as loss of enjoyment of life.

## VII.   COUNT TWO – RETALIATION IN VIOLATION OF TITLE VII

92.   Based on the foregoing, the Town retaliated against Zimnoch for having complained about discrimination based on her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq*.

93.   The Town retaliated against Zimnoch intentionally, with malice, and/or with reckless indifference to Zimnoch's federally protected rights.

94.   The Town's actions have caused Zimnoch to suffer damages, including, but not limited to, lost compensation, wages and benefits, emotional and physical distress, damage to her reputation, as well as loss of enjoyment of life.

## VIII.   COUNT THREE –DISCRIMINATION IN VIOLATION OF CONNECTICUT GENERAL STATUTES SECTION 46a-60(b)(1)

95.   Based on the foregoing, the Town discriminated against Zimnoch based on her gender in violation of Connecticut General Statutes Section 46a-60(b)(1).

96.   The Town discriminated against Zimnoch intentionally, willfully, wantonly, and/or with reckless indifference to Zimnoch's rights.

97.   The Town's actions have caused Zimnoch to suffer damages, including, but not limited to, lost compensation, wages and benefits, emotional and physical distress, damage to her reputation, as well as loss of enjoyment of life.

IX.   **COUNT FOUR – RETALIATION IN VIOLATION OF CONNECTICUT
      GENERAL STATUTES SECTION 46a-60(b)(4)**

98.   Based on the foregoing, the Town retaliated against Zimnoch for having

      complained about discrimination based on her gender, in violation of

      Connecticut General Statutes Section 46a-60(a)(4).

99.   The Town retaliated against Zimnoch intentionally, willfully, wantonly, and/or

      with reckless indifference to Zimnoch's rights.

100.  The Town's actions have caused Zimnoch to suffer damages, including, but

      not limited to, lost compensation, wages and benefits, emotional and physical

      distress, damage to her reputation, as well as loss of enjoyment of life.

**X.      PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests:

    a.      Money damages, including compensatory damages;

    b.      Damages for emotional distress, loss of self-esteem and consequential

            damages;

    c.      Punitive damages;

    d.      Statutory Attorneys' Fees;

    e.      Costs;

    f.      Interest; and

    g.      Such other and further relief as the Court deems just and equitable.

Plaintiff demands a trial by jury.


                                        PLAINTIFF, EVA ZIMNOCH

                                        *Anthony J. Pantuso, III*
                                        Anthony J. Pantuso, III
                                        Fed. Bar No. ct11638
                                        Law Offices of Anthony J.
                                        Pantuso, III
                                        4 Research Drive, Suite 402
                                        Shelton, CT 06484
                                        203-726-0284
                                        apantuso@pantusolawfirm.com