## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Eva Zimnoch, | : | |
|     *Plaintiff*, | : | |
| | : | No. 3:19-cv-1883 (VLB) |
| v. | : | |
| | : | |
| Town of Wilton, | : | September 28, 2022 |
|     *Defendant*. | : | |

## MEMORANDUM OF DECISION ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 60]

Plaintiff, Eva Zimnoch ("Zimnoch"), brings this action against Defendant, the Town of Wilton (the "Town"), alleging that Wilton discriminated and retaliated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 *et seq.*  Pending before the Court is the Town's Motion for Summary Judgment.  [Mot., Dkt. 60].  For the reasons set forth below, the Motion for Summary Judgment is GRANTED.

## I.    LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no genuine factual disputes exist.  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id*. (citing

1

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (hereinafter "*Liberty Lobby*"); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010). Conclusions and characterizations must be supported by factual allegations to overcome summary judgment. *See National Rifle Association of America v. Vullo*, --- F.4th ---, 2022 WL 4372194, at *9 (2d Cir. 2022).

II.    BACKGROUND

The following facts are taken from the Local Rule 56 statements of material facts and evidence cited by the parties.[1]  The facts are read in the light most favorable to the non-movant, Zimnoch.  *Liberty Lobby, Inc.*, 477 U.S. at 255.

Zimnoch is a female who has worked for the Wilton Police Department (the "WPD") since 2005.  [Def.'s 56(a)1 ¶ 1, Dkt. 60-1]. She began her career with the WPD as a police officer and rose to the ranks of detective in 2015.  [*Id.*].  She is the first and only female detective in the WFP. [Def.'s Ex. 42 (CHRO Aff.), Dkt. 60-44]. Zimnoch's claims of discrimination and retaliation stem from a series of incidents that took place in and between 2016 and 2019. The Court will summarize each of these incidents separately.

### A. 2016 CHRO Complaint

In 2016, Zimnoch filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging gender discrimination and retaliation in violation of Title VII and CFEPA.  [Def.'s 56(a)1 ¶ 2]. The parties executed a settlement agreement on March 6, 2018, wherein Zimnoch released all

---

[1] Local Rule 56(a)1 outlines the requirements for setting forth each material facts as to which the moving party contends there is no genuine issued to be tried. The party opposing summary judgment can respond the material facts listed by the movant in the 56(a)1 statement by either admitting or denying the fact.

Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial.

Local Rule 56(a)3.  "Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1." *Id.*

claims against the Town through the date of the agreement in consideration of $17,500.  [Def.'s Ex. 3 (Settlement Agreement), Dkt. 60-5).  In the agreement, the Town "strongly denie[d]" all allegations of discrimination and retaliation.  [*Id*. at 1].

### B. Zimnoch's Participation in SWRERT

In or around 2013, Zimnoch became a member of the Southwest Regional Emergency Response Team ("SWRERT"), a specialized team comprised of officers from neighboring town police departments. [Def.'s 56(a)1 ¶ 4].  SWRERT has a mandatory requirement that members attend at least two trainings per month.  [*Id.*]. On September 14, 2017, Zimnoch was placed on "inactive status" after she failed to attend "a significant number" of trainings. [*Id.* ¶ 5]. That same day, Zimnoch met with the SWRERT commander, and they came up with a plan to reinstate her, which required her to attend all trainings for the next three months. [*Id.*].  In October 2017, Zimnoch raised concerns about a change in tactics by the SWRERT, which she believed presented a public safety concern.  [*Id.* ¶¶ 51–52].  Zimnoch was absent from both trainings in November, but was given another opportunity to attend three continuous months of training starting in December 2017. [*Id.* ¶ 6]. Zimnoch was absent from another training session on February 14, 2018 during the continued probationary period.  [*Id.*].  As a result of her absences, she was dismissed from SWRERT.  [*Id.*].

In January 2019, nearly a year after she was dismissed from SWRERT, she renewed her concerns from October 2017 about the new tactics taken by SWRERT. [*Id.* ¶ 52].  Zimnoch claims she was reminded of her concern following a nightmare she had.  [*Id.* ¶ 51].

4

### C. **PBA Holiday Party**

On January 13, 2018, Zimnoch attended a Police Benevolent Association ("PBA") holiday party at a local bar. [Def.'s 56(a)1 ¶ 7]. At the bar, Zimnoch created a "drunken aggressive disturbance" targeted at members of the public. [*Id.*]. She then went to the police station, while still intoxicated, and caused a disturbance there. [*Id.*].

This conduct led to an internal investigation that culminated in a two-day suspension on March 16, 2018. [*Id.*]. During the pendency of the investigation, Zimnoch sent WPD Operations Captain Robert Cipolla ("Captain Cipolla") an email claiming that her "mental health issues and psychiatric medication adjustments" contributed to her conduct at the PBA party. [*Id.* ¶ 8].

On February 2, 2018, Zimnoch complained to Captain Cipolla that her colleague in the detective bureau, Detective Sear, made a "spontaneous" comment about the investigation that made her feel "intimated and uncomfortable." [*Id.* ¶ 9]. Captain Cipolla investigated Zimnoch's allegations and found that Zimnoch initiated a conversation with Detective Sear about the investigation, during which Detective Sear stated "it doesn't come at a good time for you." [*Id.* ¶ 10]. Detective Sear's statement was referring to an internal investigation into her behavior immediately after the CHRO complaint was settled. [*Id.* ¶ 10]. Zimnoch denies that she initiated the conversation with Detective Sear and claims that Detective Sear actually stated "well, that was a stupid thing to do at this time." [Pl.'s 56(a)2 ¶ 10; Pl.'s Ex. B (Zimnoch Dep.) 51:17]. Ultimately, there was no finding that Detective

Sear engaged in intimidating, harassing, or threatening behavior towards Zimnoch. [*Id.* ¶¶ 12, 14].

### D.  K-9 Officer Facebook Post

In May 2017, Zimnoch saw a Facebook post involving a K-9 officer who took credit for an arrest that Zimnoch believes she should have gotten credit for.  [Def.'s 56(a)1 ¶ 16].  She was disappointed that she did not receive credit for the arrest and spoke with the Union President, Tim Fridinger, about the incident. [*Id.*]. Detective Kip Tarrant and Chief John Lynch allege that Zimnoch was yelling at Fridinger outside the police precinct so loudly they overheard the conversation from inside the building. [*Id.* ¶ 16]. Detective Tarrant also claims that Plaintiff stated that "if a supervisor was here, [she] would be getting written up or suspended." [*Id.* ¶¶ 16, 24].  Plaintiff denies yelling at Fridinger and making the comment Detective Tarrant claims she made.  [Pl.'s 56(a)2 ¶ 16].  Plaintiff suggests that the reason Detective Tarrant and Chief Lynch knew about the conversation she had with Fridinger is because the conversation took place right under Chief Lynch's office window.  [*Id.*].  Chief Lynch and Captain Conlan spoke to Zimnoch about this incident. [Dkt. 60-1 ¶ 16].

### E.  Performance Improvement Plan

In May 2018, Zimnoch was placed on a non-disciplinary performance improvement plan ("PIP") after the WPD determined that she had been struggling with completing her assignments. [Dkt. 60-1 ¶ 18]. Specifically, Captain Lynch found that Zimnoch was having issues with report and warrant writing, organization, accuracy, and following up on investigations and supervisory

instruction. [*Id.*]. According to Fridinger, Zimnoch is the only officer in the department to ever have been placed on a PIP.  [Pl.'s Ex. E (Fridinger Dep.) 124:15-125:9]. The Town claims that though other detectives had performance issues in the past, these issues were not as significant as Zimnoch's performance issues. [Def.'s 56(a)1 ¶ 19]. Zimnoch was informed that "failure to complete the PIP could lead to discipline, up to and including termination." [Pl's. Ex A (Pl. Aff.) ¶ 21]. In August 2018, the WPD removed Zimnoch from the PIP after determining her performance rose to a satisfactory level.  [Def.'s 56(a)1 ¶ 21].

In August 2018, during a meeting about the PIP with Captain Cipolla and Lieutenant Kluk, Zimnoch provided copies of other detectives' reports containing errors similar to those in Zimnoch's reports. [Pl.'s Ex. A ¶ 23]. During this meeting, the WPD learned that Zimnoch had supervisory access to the computer system that she should not have been authorized to have. [Def.'s 56(a)1 ¶ 26]. After this meeting, the WPD revoked Plaintiff's supervisory access. [Dkt. 60-1 ¶ 27].  While Zimnoch was not authorized to have supervisory access to the computer system, Detective Sear did, but he was assigned as an intellectual technology liaison for the WPD.  [Def.'s Ex. 7 (Cipolla Aff.) ¶ 25].

F.  Zimnoch's Attendance Issues

In fiscal years 2017 and 2018, Zimnoch's sick leave attendance was identified as excessive absenteeism.  [Def.'s 56(a)1 ¶ 29].  "Excessive" is determined by taking the average sick leave and adding 20%. [Def.'s Ex. 7 ¶ 27]. Zimnoch acknowledges that she used more sick time than her colleagues, but claims her "working conditions were affecting her health." [Pl.'s 56(a)2 ¶ 29]. Captain Cipolla

claims he spoke to Zimnoch about her absences, asked her whether everything was okay and if she needed any workplace accommodations. [Def.'s 56(a)1 ¶ 30]. Zimnoch claims Captain Cipolla never spoke with her about her attendance.  [Pl.'s 56(a)2 ¶ 30].  Zimnoch was never disciplined for her excessive absenteeism. [Def.'s 56(a)1 ¶ 30].

### G. Detective Sear's Fan

On August 15, 2018, Detective Sear made a complaint about an incident involving a fan he purchased for him to use at the office.  [Def.'s 56(a)1 ¶ 31]. According to the complaint, Zimnoch stated that she wanted an office fan as well, to which Detective Sear responded that she should purchase one like he did.  [*Id.*]. After that conversation, Zimnoch wrote her name of Detective Sear's fan in permanent marker.  [*Id.*].

Captain Cipolla questioned Zimnoch about this incident and Zimnoch stated that her actions were meant to be a joke.  [Pl.'s 56(a)2 ¶ 31].  Captain Cipolla concluded that Zimnoch's conduct was improper and an email was placed in her training file stating that he "advised [Zimnoch] that writing her name on property not belonging to her is not appropriate."  [Def.'s 56(a)1 ¶ 32; Def.'s Ex. 19 (Oct. 16, 2018 Email)]. Detective Sear requested that the WPD generate an official incident number, which is one of the steps required to open a criminal investigation. [Pl.'s 56(a)2 ¶ 33; Pl.'s Ex. H (John Lynch Depo.) 52:23-53:3].  Detective Sear told Fridinger that he was making a complaint about this because "if she wants to complaint about me, now I'm going to complaint about her, so now is my chance." [Pl.'s Ex. H 104:7-18].

H. **Extra Duty**

Police officers are permitted to work extra duty assignments to earn additional compensation. [Def.'s 56(a)1 ¶ 34]. The WPD has a policy to determine who gets to work these assignments. [*Id.*]. Extra duty assignments are first awarded to officers who are on their day off and have the least number of hours for a particular month. [Def.'s Ex. 7 ¶ 33]. If two officers are equal in hours, then the more senior officer gets the assignment. [*Id.*]. Extra duty assignments may not interfere with an officer's normal work hours and assigned duties. [*Id.*].

In January 2018, the detective bureau adopted a new schedule—Detective Tarrant, the most senior detective, elected to work evenings, Detective Sear, the next most senior detective, elected to work days, and Zimnoch, the least senior detective, was given a choice of days or evenings with the caveat that she must cover days if Detective Sear was out. [Def.'s 56(a)1 ¶ 36]. Plaintiff elected to work days. [*Id.*]. Most extra duty assignments were during regular business hours, so Detective Tarrant had the most opportunity to work extra duty. [*Id.* ¶ 37].

Detectives who wanted to work extra duty were expected to request permission to do so in advance. [*Id.* ¶ 36]. On multiple occasions, Zimnoch failed to comply with this procedure and, instead, would simply notify her supervisor at the last minute that she was working an extra duty shift. [*Id.* ¶ 39]. On most occasions, Zimnoch was permitted to take the extra shift, but was reminded that in the future she needed to make the request in advance to ensure the detective bureau is staffed appropriately. [*Id.* ¶ 39]. From March 2018 through November

2019, Zimnoch earned $23,750.83 from extra duty shifts while Detective Sear only earned $8,917.65. [*Id.*].

On December 17, 2018, two officers reported to Captain Kluk that Zimnoch made disparaging comments about another officer and stated she was going to "make it uncomfortable for officers to work extra duty jobs like she is making it uncomfortable in the detective bureau." [Dkt. 60-1 ¶ 49; Dkt. 60-9 ¶ 47]. Captain Cipolla spoke to Zimnoch about these allegations and Zimnoch stated that she did not recall making this comment. [Dkt. 60-9 ¶ 47; Dkt. 63-4 125:18-126:8].

### I. December 10, 2018 Complaints

On December 10, 2018, Zimnoch complained that she was (1) not permitted to work extra duty assignments, (2) being locked out of investigations in the computer, and (3) assigned a disproportionate number of cases as compared to her colleagues. [Dkt. 60-1 ¶ 40]. Captain Cipolla investigated each of these complaints. [*Id.*].

Zimnoch's complaint that she was prevented from working extra duty assignments was prompted by an incident where her request was denied because she was needed at work to attend to a scheduled arrest. [*Id.* ¶ 44]. Captain Cipolla followed up with Zimnoch in February 2019 and offered to discuss switching her schedule. [*Id.* ¶ 45]. Zimnoch told Captain Cipolla that her extra duty had improved, and she would get back to him if she wanted to switch her schedule. [*Id.* ¶ 46]. Zimnoch does not recall this conversation. [Dkt. 63-4 110:25-111:4].

As to her complaint that she was locked out of investigations, Captain Cipolla determined that, pursuant to WPD policy, Zimnoch was unable to access

her colleagues' juvenile cases or cases that were classified as "sensitive." [*Id.* ¶¶ 41–42]. Her colleagues were not able to access her cases in these categories. [*Id.*] Zimnoch had roughly the same number of cases in these categories as her colleagues. [*Id.*].

After reviewing assignments, Captain Cipolla concluded that there was no disparity in the way investigations were assigned to detectives, but acknowledged that Zimnoch was assigned additional investigations because Detectives Sear and Tarrant were on leave for an extended period and Plaintiff was the only available detective. [*Id.* ¶ 48]. In January 2019, Captain Kluk reassigned one of Zimnoch's cases to lessen her caseload. [*Id.*].

## J. Confrontations with Detective Sear

In August 2018, Zimnoch complained that she felt uncomfortable working with Detective Sear because he refused to work with her. [*Id.* ¶ 67]. Captain Cipolla investigated this allegation and concluded that it arose from Detective Sear's desire to drive himself to court on one occasion. [*Id.* ¶ 68].

Detective Sear stated that the union president told him that Zimnoch was recording him. [*Id.* ¶ 69]. Zimnoch denied that she recorded him, but admitted to taking photographs of him working on non-department business on his work computer during business hours. [Dkt. 63-1 ¶ 68].

In October 2018, the Town offered to pay for a conflict resolution specialist to mediate Zimnoch and Detective Sear's issues. [Dkt. 60-1 ¶ 69]. Detective Sear agreed to mediation when he returned from leave at the end of November 2018, at which point the Town engaged a mediator and reached out to Zimnoch's counsel

on December 3, 2018.  [*Id.* ¶ 70].  The Town discussed with the parties whether they should wait until after the holidays to start mediation at which time Zimnoch's counsel stated that she did not want to participate in mediation. [*Id.* ¶ 71].

Captain Cipolla told Zimnoch and Detective Sear that one of them could voluntarily step down to patrol if they could not agree to work together. [*Id.* ¶ 14]. Zimnoch disputes this, alleging that he only suggested that she step down, not Detective Sear.  [Dkt. 63-1 ¶ 14].  Ultimately, they both agreed to continue working together.  [Dkt. 60-1 ¶¶ 12, 14].

At a detective's meeting on February 1, 2019, there was a disturbance involving Zimnoch and Detective Sear. [Dkt. 60-1 ¶¶ 53–55; Dkt. 60-9 ¶¶ 50–53]. Captain Cipolla's investigation into the incident revealed that both Zimnoch and Detective Sear violated WPD operating procedure. [Dkt. 60-29 (Def. Ex. 27, Memo re Inv. into 2/1/2019 Meeting)]. The investigation found that Zimnoch exhibited "anger, intimidation, and aggressiveness." [*Id.*].  Both Zimnoch and Detective Sear received written reprimands. [Dkt. 60-1 ¶ 55; Dkt. 60-9 ¶ 60].

### K.  Fitness for Duty Exam

Captain Cipolla was concerned about a pattern of behavior exhibited by the Zimnoch and recommended that she be subject to a fitness for duty examination. [*Id.* ¶ 58]. Captain Cipolla, the Chief, and a human resources representative met with Zimnoch and her union representative to inform her that she was being placed on paid administrative leave pending the results of her fitness for duty exam.  [*Id.* ¶ 59].  Captain Cipolla does not recall any other officer being referred for a fitness for duty exam.  [Dkt. 63-6 (Pl. Ex. D, Cipolla Dep.) 102:23-103:3].

On March 11, 2019, Captain Cipolla issued a memorandum to Chief Lynch outlining his recommendation that Zimnoch be evaluated for fitness for duty. [Def.'s Ex. 30].  The memorandum discussed the Facebook post incident, the PBA Christmas party incident, the December 2018 comments about making it uncomfortable for officers to work extra duty jobs, and an incident in January 2019 where she acted angrily towards a School Resource Officer for simply asking her if everything was OK.  [*Id.*].  Capital Cipolla reported the Zimnoch had a number of sustained and uncontrollable periods of crying at work and made admissions of "nightmares, anxiety, anxiety medication use . . . , and her recent statement to [another officer] about her medication not working effectively . . . ."  [*Id.* at 2].

On March 13, 2019, Zimnoch went on paid leave. [Dkt. 60-1 ¶ 60]. Human resources made arrangements for Zimnoch to be evaluated by a physician whose earliest available appointment was May 14.  [*Id.* ¶ 61].  The two-day evaluation took place on May 14 and 15 after which the physician determined that Zimnoch was fit for duty and she was immediately reinstated. [*Id.* ¶ 65].

Before going on leave, Zimnoch filed a grievance related to the reprimand she received for her conduct at the meeting. [Dkt. 63-3 ¶ 63]. After returning to work, she met with Chief Lynch, Captain Cipolla, and Fridinger to address the grievance.  [*Id.* ¶ 65].  Before the meeting started, Chief Lynch presented Zimnoch with a letter denying her grievance. [*Id.*]. Fridinger does not recall any other instance where a grievance had been denied before the initial meeting. [Dkt. 63-7 138:8-21].

## L.  <u>Comments by Other Officers</u>

Zimnoch alleges that when she was doing a background investigation on a transgender candidate for the WPD, Captain Kluk told her to "find something wrong with him." [Dkt. 60-1 ¶ 73]. Captain Cipolla investigated this allegation and concluded that Captain Kluk did not say that. [Dkt. 60-9 ¶ 68]. This candidate passed the background and proceeded to the next step in the hiring process. [*Id.*].

On August 15, 2018, Zimnoch complained about she heard Captain Kluk use the term "angry dolphin" in reference to a sexual act that occurred in Zimnoch's investigation into a juvenile sexual abuse incident. [Dkt. 60-1 ¶ 73]. Captain Kluk admitted that he used the term "angry dolphin," but could not recall the context. [*Id.* ¶ 74]. This incident was documented in his training file, and he was cautioned to not make those types of comments in the future. [*Id.*].

Zimnoch complained that Training Officer Michael Tyler made an inappropriate comment about a female co-worker. [*Id.* ¶ 75]. As a result, Officer Tyler was suspended. [*Id.*].

### M. 2019 CHRO Complaint

In February 2019, Zimnoch filed a CHRO complaint alleging that in 2018 to 2019 she was delegated unequal duties, discriminated against in terms and conditions of employment, harassed, and retaliated against due to her gender and previously filed complaint based on the events set forth in the underlying Complaint. [Dkt. 60-44 (Def. Ex. 42, 2019 CHRO Aff.)].  She subsequently filed this lawsuit on November 26, 2019. [Dkt. 1 (Compl.)

### III.   DISCUSSION

Counts I and III are claims under Title VII and the CFEPA for discrimination based on Plaintiff's gender. Counts II and IV are claims under Title VII and the CFEPA for retaliation against Plaintiff after she filed a CHRO complaint alleging gender discrimination.

Defendant moves for summary judgment on all claims arguing: (1) the allegations that occurred prior to March 6, 2018, were waived pursuant to the CHRO Settlement Agreement; (2) the allegations that occurred prior to August 15, 2018 are untimely under the CFEPA and the allegations that occurred prior to April 17, 2018 are untimely under Title VII; (3) Plaintiff cannot establish a *prima facie* case of retaliation or discrimination; and (4) even if she can establish a *prima facie* case, Defendant has articulated legitimate, non-discriminatory reasons for its conduct and Plaintiff has not established that those reasons were pretextual.

### A. Discrimination Claims

Title VII and the CFEPA prohibit an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment" based on the individual's gender. 42 U.S.C. § 2000e; Conn. Gen. Stat. § 46a-60(b)(1).

> [T]his language "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment.

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe

or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' . . . Title VII is violated." *Id.* To prevail on a claim of hostile work environment based on gender discrimination, a plaintiff must establish that the abuse was based on her gender. *Kaytor*, 537 F.3d at 547.

Discrimination claims under both Title VII and the CFEPA are analyzed under the three-step *McDonnell Douglas*[2] burden shifting framework. *See Bentley v. AutoZoners LLC*, 935 F.3d 76, 88 (2d Cir. 2019) (CFEPA); *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (Title VII). Under the *McDonnell Douglas* framework, a plaintiff must first establish her *prima facie* case of discrimination by showing: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega*, 801 F.3d at 83. Once the plaintiff satisfies this initial step, the burden then shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If a defendant can satisfy this second step, the burden then "shifts back to the plaintiff to prove that the employer's reason was in fact pretext for discrimination." *Id.*

Here, the analysis starts and ends at step one. Plaintiff fails to establish her *prima facie* case of discrimination because she has not alleged sufficient facts to satisfy the fourth prong requiring circumstances giving rise to an inference of discrimination based on her gender. In response to Defendant's argument that Plaintiff has failed to establish an inference of gender discrimination, Plaintiff

---

[2] 411 U.S. 792 (1973).

simply states that "[f]or the same reasons that [Plaintiff's] retaliation claims stand, her discrimination claims also must stand." [Dkt. 63 p. 33]. Plaintiff provides no legal or factual argument as to why retaliation for engaging in protective speech constitutes gender discrimination, even when the protective speech involves gender discrimination claims. These are two evils that are separate and distinct. While there are circumstances where a person is discriminated both on the basis of their gender and for speaking out against gender discrimination, the existence of one does not automatically establish the other. To state simply, Plaintiff has not met her burden in setting forth specific facts establishing an inference of discrimination, which is an essential element of her gender discrimination claims.

Therefore, the Court grants summary judgment as to the Title VII and CFEPA discrimination claims.

### B. Retaliation Claims

Title VII and the CFEPA prohibit an employer from discriminating against any individual for filing a charge or complaint. *See* 42 U.S.C. § 2000e 3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing[.]"); Conn. Gen. Stat. § 46a-60(b)(4) (it is unlawful for an "employer . . . [to] discriminate against any person . . . because such person has filed a complaint or testified or assisted in any proceeding[.]").

Retaliation claims are also analyzed under the *McDonnell Douglas* burden shifting framework. *See supra*. Plaintiff must show that "(1) she participated in an

activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor*, 609 F.3d at 552.

Defendant argues that Plaintiff did not suffer an adverse employment action and, even if she did, there was no causal connection between the protected activity and the adverse employment action. The Court agrees with Defendant finds that Plaintiff has failed to allege sufficient facts to make out the third and fourth elements of *McDonnell Douglas*.

### 1.  Adverse Employment Action

An adverse employment action is any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). The Supreme Court intended this definition to cover a broad range of conduct and directs lower courts to look at the context in which such actions occur. *Id.* at 64.

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*Id.* at 69.

Defendant argues that none of the purported actions that anyone in the WPD took against Plaintiff rose to the level of adverse employment actions and, at most, were "petty slights or minor annoyances that often take place at work and that all employees experience." [Dkt. 60-2 p. 29 (citing *Burlington*, 548 U.S. at 68]. Defendant then goes through each alleged action and cites to persuasive legal authority in support of its position. [*Id.* at 29-33].

In her opposition, Plaintiff fails to address each separate incident and instead urges the Court to consider the totality of the circumstances in finding that she suffered an adverse employment action. Specifically, she alleges, with no support, that "[t]he creation of a hostile work environment, in and of itself, is [] an adverse employment action." [Dkt. 63 p. 22]. Plaintiff does not provide any legal basis for this contention.   However, the Court can conceive of circumstances where the totality of the circumstances would be sufficient to constitute an adverse employment action, but not under the facts of this case. *See Burlington*, 548 U.S. at 69 ("[a]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct"). Nor do these incidents independently rise to the level of an adverse employment action.

Plaintiff alleges that Detective Sear "subjected [her] to such a pattern of 'intimidation, ridicule, and insult' so as to alter the conditions of her employment. [Dkt. 63 p. 23].  To support this allegation, Plaintiff claims that Sear "harassed her on a daily basis."  [*Id.*].  This is a conclusion and characterization not supported by factual allegations.  *See National Rifle Association of America*, --- F.4th at ---, 2022

WL 4372194, at *9.  Plaintiff also claims that Detective Sear's refusal to work with her supports her conclusion that she was subjected to a pattern of intimidation, ridicule and insult.  Plaintiff's claim is unpersuasive as the simple refusal to work with someone is not enough to justify a conclusion of intimidation, ridicule, or insult.

Though an adverse employment action can be established by showing that the employer "knew but failed to take action to abate retaliatory harassment inflicted by co-workers," that is not the case here.  *Richardson v. New York State Dep't of Corr.*, 180 F.3d 426, 446 (2d Cir. 1999). The evidence shows that Plaintiff and Detective Sear had a contentious relationship, often triggered by Plaintiff's behavior, such as the disturbance at the detective's meeting and her misappropriation and defacement of Detective Sear's property.  Leadership at the police department knew about and tried to remediate these issues; they offered to pay for mediation, which Plaintiff declined. The parties dispute whether, in response to their issues, Captain Cipolla gave both Plaintiff and Detective Sear or just Plaintiff the option to move to a different division. However, even assuming this option was only offered to Plaintiff, it does not amount to an adverse employment action since it was merely an offer and did not alter her conditions of employment. Finally, Detective Sear's comment about the investigation into Plaintiff's conduct at the holiday party and his statement that he only filed the complaint about the fan because Plaintiff complained about him, were merely "petty slights or minor annoyances," not retaliatory harassment.

Plaintiff argues that due to schedule changes she was unable to take on extra duty assignments. The parties dispute whether Plaintiff chose this schedule or whether she was assigned to it. Regardless, this claim has no merit as the evidence shows that Plaintiff nearly always received permission to work extra duty assignments unless it interfered with regularly scheduled work shifts. In fact, Plaintiff received more compensation for extra duty assignments from March 2018 to November 2019 than Detective Sear.

Plaintiff alleges that the written reprimand she received on February 19, 2019 for her conduct at the detective bureau meeting constitutes an adverse employment action. "District courts within the Second Circuit have often found, however, 'that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." *See Abraham v. Potter*, 494 F. Supp. 2d 141, 147 (D. Conn. 2007) (collecting cases). Thus, the February 2019 reprimand on its own does not constitute an adverse employment action.  There are no other circumstances presented that would warrant finding it to be an adverse employment action as Plaintiff was not demoted, terminated, or otherwise adversely affected with this reprimand in mind.

Finally, correcting Plaintiff's access to certain investigations in the computer system does not constitute an adverse employment action. Plaintiff's access to other detective's investigations was removed after the department learned she had unauthorized access.  Someone in Plaintiff's position was never supposed to have

access to these investigations, therefore the restrictions were not a materially adverse change to her employment.

The only claim that Plaintiff distinguishes as a separate adverse employment action is her placement on leave pending a fitness for duty examination. [Dkt. 63 p. 27]. Plaintiff cites to cases outside the Circuit to support her argument. *See e.g.*, *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763 (6th Cir. 2018) (finding cumulative effect of being referred for a fitness for duty exam, placed on leave, escorted out of the office, having her badge removed, and an out-of-office email stating that plaintiff was no longer with the company sufficient to satisfy the third element of *McDonnell Douglas*); *Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584, 594-95 (6th Cir. 2007) ("Of all the actions that [plaintiff] alleges, her placement on a 90-day performance plan after she had returned from administrative leave comes the closest to meeting the above definition of a materially adverse employment action....Ultimately, however, we need not decide whether [plaintiff's] performance plan constituted a materially adverse action…."); *Booth v. Pasco County Fla.*, 757 F.3d 1198, 1206 (11th Cir. 2014) (upholding jury finding that forcing plaintiffs to sign a statement under threat of termination which resulted in a fitness for duty exam was an adverse employment action). Contrary to Plaintiff's argument, these cases do not support her unequivocal statement that leave pending a fitness for duty exam is an adverse employment action.

Courts in this Circuit have found that fitness for duty exams do not ordinarily qualify as an adverse employment action unless the evidence shows that "testing has been manipulated by the employer to depart from standard testing

requirements and to deter the employee from returning to service." *Ramirez v. Town of Oxford*, No. 3:21-CV-240 (JAM), 2022 WL 3646203, at 5* (D. Conn. Aug. 24, 2022) (citing *Larsen v. Berlin Bd. Of Educ.*, 2022 WL 596677, at *5 (D. Conn. 2022)).

Here, Plaintiff was placed on leave pending a fitness for duty examination in March 2018. During her leave, she was paid her full salary and her job was secure. She was immediately reinstated to the same position after being found to be fit for duty in June 2018. Plaintiff's situation is clearly distinguishable from instances the Second Circuit has classified as adverse actions such as "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Galabaya v. New York City Bd. of Educ.*, 202 F.3d, 636, 640 (2d Cir. 2000). As such, a reasonable jury could not find that Plaintiff suffered any adverse employment actions.

### 2. Causation

The only arguable adverse employment action Plaintiff was subjected to was when she was placed on leave pending a fitness for duty examination. While, as found above, the Court finds this is not an adverse employment action for the purpose of establishing Plaintiff's retaliation claim, even if it was, Plaintiff has not met her burden by establishing a causal connection between the that action and her protected activity.

A Title VII retaliation claim "require proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer," which is commonly known as but-for causation. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "The causal connection needed for

23

proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001).  *See also Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013).  "Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [the court has] previously held that five months is not too long to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (citing to *Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 555 (2d Cir. 2001)).

Plaintiff has not met her burden in setting sufficient facts to satisfy the causation element of her claim.  First, Plaintiff's protected activity—engaging in the CHRO complaint process—concluded over a year before Plaintiff was placed on leave.  This span of time is too attenuated to establish causation both due to the span of time and due to the lack of any other fact tying the two events together.  Second, Plaintiff presents no facts connecting her placement on leave with her engaging in the CHRO process.  There is an abundance of evidence showing that Plaintiff's placement on leave was entirely motivated by her erratic, combative, and outward and admitted emotional state.

In a memo to Chief Lynch, Captain Cipolla lists concerning incidents involving Plaintiff justifying her placement on leave pending a fitness for duty exam. Some examples include:

On May 18, 2017 ZIMNOCH became outwardly angry about a Facebook post by the Wilton Police K-9 Officer in which she believed she was

not given the appropriate credit for a recent arrest. While on-duty ZIMNOCH stated to DETECTIVE KIP TARRANT…"if a supervisor was here I [ ] would be getting written up or suspended" and "that she did not know what she was going to do and all of this is building up in her." ZIMNOCH would later go outside the police building and begin to yell at Union President Tim Fridinger so loudly it was overheard by both TARRANT and Chief Lunch who were inside the police building in separate locations at the time….

On January 13, 2018 ZIMNOCH was involved in an off-duty incident following the Police Benevolent Association Christmas party in the Town of Fairfield. The incident involved acts of anger, aggression, and intimidation exhibited by ZIMNOCH toward several bar patrons not affiliated with the Wilton Police Department….

In addition to the outward displays of anger and aggression, there have been a number of sustained and uncontrollable periods of crying while at work….

Moreover, also relevant to my concerns are ZIMNOCH's own admissions of nightmares, anxiety, anxiety medication use, and her recent statement to MACLEAN bout her medication not working effectively.

[Dkt. 60-32 (Def. Ex. 30)]. The evaluation was clearly triggered by Plaintiff's behavior erratic behavior, her outward signs of emotional distress, and her own admission of emotional distress.  As a police officer, Plaintiff holds a unique position in society; she is empowered to carry a lethal weapon with the authority to command members of the general public. Her mental health is of utmost importance to her position and her statements and behavior raise cause for concern.

Since Plaintiff has failed to establish a prima facie case of retaliation, the Court's analysis ends at the first step of *McDonnell Douglas*. Therefore, the Court grants summary judgment on the retaliation counts.

IV.    CONCLUSION

For the above reasons, the Court grants Defendant summary judgment as a matter of law.  The Clerk is directed to close this case.

IT IS SO ORDERED

_____/s/_____

**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: September 28, 2022**